GRIFFIS, P. J., for the Court:
¶ 1. Benjamin White was found guilty by a jury sitting before the Madison County County Court of misdemeanor home-repair fraud under Mississippi Code Annotated section 97-23-103 (Rev.2006). The county court sentenced White to six months in the custody of the Sheriff of Madison County, with all but fifteen days of said sentence conditionally suspended, and to pay a $1,277 fine and restitution in the amount of $37,539.33.
*489 ¶ 2. White appealed to the Madison County Circuit Court, where it was argued that: (1) no disproportionate amount of work was done to the home in question compared to the amount of money advanced by the homeowners; (2) no home-repair fraud was committed because in the contract White and the homeowners specifically provided that if the homeowners failed to make payments White could stop work on the project; (3) the county court erred in allowing evidence that White failed to pay some of his subcontractors; (4) the county court erred in refusing to grant defense jury instruction D-12; (5) the county court erred in refusing to consider testimony from White’s expert witness when determining the amount of restitution; and (6) White’s conviction of home-repair fraud will operate to subject an enormous number of contractors to criminal prosecution in this State.
¶ 3. The circuit court affirmed White’s conviction and sentence. This appeal followed. Finding no reversible error, we affirm the circuit court’s judgment, which affirmed the county court’s judgment.
FACTS
¶ 4. On October 11, 2005, David and Joanne Buchanan accepted a $90,300 proposal/offer from White, owner of BW Construction, for the performance of certain renovations and additions to their home. Under the general terms of the contract, White agreed to convert the home’s two-car garage into a living room area; build a three-car garage with a bonus room and a bathroom in the space above it; construct a hallway, with a half bath and a closet, adjoining the said structures; install new granite countertops in the home’s kitchen; and replace the home’s existing driveway with a circular driveway. The $90,300 contract total covered all the material and labor necessary to meet the itemized specifications listed in the contract. That amount was subsequently reduced to $86,247.45, after the parties agreed to modify the contract to allow the Buchan-ans, instead of White, to purchase and install the granite countertops and pay for the cost of the building permit.
¶ 5. Pursuant to a provision in the contract, the Buchanans paid White a $22,500 down payment immediately after accepting White’s initial proposal, and they agreed to submit further payments to White “on each Friday as the work progress[ed] to the value of 100% of all work completed[— t]he entire amount of the contract [to be] paid within [two] days after completion.”
¶ 6. The contract also contained the following provision:
If payment is not made when due, [White] may suspend work on the job until such time as all payments due have been made. A failure to make payments for a period in excess of [two] days from the due date of the payment shall be deemed a material breach of this contract.
¶ 7. From October to December 2005, the Buchanans issued a number of draws to White by check, as follows: $6,000 on October 21; $6,500 on October 28; $9,000 on November 4; $1,400 on December 5; and $7,650 on December 9. According to David, White told him that building materials, such as lumber and Sheetrock, were in short supply and increasing in price due to the aftereffects of “Hurricane Katrina,” and he needed advances in order to reserve or pay for the materials.
¶ 8. On Friday, December 16, 2005, White reportedly telephoned David and asked for another draw. David, who was out of town on business, told White that he was concerned that the amount of work White had done, which David estimated to be approximately ten to fifteen percent of the contract, did not mesh with the $53,050 *490 he had already advanced to White. David then informed White that he would not advance him any additional funds until the work caught up with the amount of funds already provided to White.
¶ 9. Later that same day, David received a telephone call from Karen Powell, who White had hired to supervise the building project at the Buchanans’ home. Powell informed David that White had called her and told her that she and the subcontractors would not be getting paid because David had refused to pay him.
¶ 10. The Buchanans met with White in his office the following week. David there told White they wanted to see progress on the project. David asked White if he had any receipts available for the materials that White had previously indicated had been purchased for the project. White reportedly was unable to produce any receipts, but said he could supply the purchased materials. The Buchanans requested that the materials be delivered to the job site before Christmas. According to David, nothing was delivered to the job site by Christmas, nor at any point thereafter.
¶ 11. David testified that White became unresponsive to his and Joanne’s attempts to contact him afterwards. Eventually, they sent White a letter informing him that they were terminating the contract because White had breached its terms. The Buchanans subsequently contacted the Mississippi Attorney General’s Office (AG), and an investigation ensued.
¶ 12. In January 2009, White provided a voluntary statement to an investigator from the AG’s office, which the State later submitted into evidence during its case-in-chief at White’s trial. According to the statement, White acknowledged that the Buchanans had paid him “approximately] $50,000 to perform work” on their home. White stated that he had charged the Bu-chanans approximately $10,000 for designs and plans for the renovation project, and he claimed that he had paid for the following:
$6,500 for [dirtwork] labor[;] ... $7,000 for the new septic unit[;] ... $3,000 for the demolition] work[;] ... $4,000 for the plumbing[,] electricalf, and] pesticide [treatment;] ... $8,000 for the foundation^] forming[,] and finishing[;] ... $5,000 for the materials for the concrete foundation, concrete, rebar, visqueen, limestone bed[;] ... $400 for the dumpster fee concerning the demolition^] ... $7,000 for the cost of the project managers to oversee [the] project[;] ... $800 for permit fees and soil samples.
¶ 13. David’s testimony disputed much of what White had claimed in his statement to the AG investigator. According to David, White did not install a new septic tank on their property, nor did the contract call for one. No electrical work was performed by White. No pesticide treatment was performed by White, as David had an annual termite plan with a pest control company that covered such treatment. No dumpster was ever placed on his property by White. David acknowledged that a concrete foundation was completed by White, but he stated that White did not pay for the concrete that was later poured over the foundation.
¶ 14. According to Powell’s trial testimony, White had promised her $700 per week to supervise the project at the Bu-chanans’ home. Powell said she worked a total of four weeks at the job site for White, but White had only paid her for two weeks.
¶ 15. Bill Reeves, a representative from Spencer Ready Mix, testified that his company sold $3,490.34 worth of concrete to White for use at the Buchanans’ home. Reeves presented an invoice showing that *491 said concrete was delivered to the Buchan-ans’ home on December 15, 2005. According to Reeves, Spencer Ready Mix has not been paid for the concrete.
¶ 16. Kenneth Barker, a representative from Hercules Concrete Pumping, testified that his company pumped the concrete at the Buchanans’ home on December 15. Barker presented an invoice showing that White was billed $683.81 for the service. According to Barker, the bill has gone unpaid.
¶ 17. During David’s testimony, David testified to all the items listed in the contract that White did or did not complete. According to David, White had completed the first three items of the fourteen items listed under section A of the contract, “Remodeling of the Existing Garage.” Item A1 called for removing and salvaging the existing garage-door unit; item A2 called for removing the existing interior walls, Sheetroek, exterior doors, and electrical fixtures; and item A3 called for installing a new concrete foundation to bring the height of the new room level with the existing home. With regard to section B of the contract, “Constructing the New Addition[s] ...,” David testified that White had completed the first three items of the twenty-eight items listed under that section. Item B1 called for removing the existing concrete driveway in preparation for the new foundation; item B2 called for installing the plumbing drain pipes and tying them into the existing treatment plant; and item B3 called for installing the new concrete foundation for the addition, as described on the plans provided for the project. David testified that White did not complete any of the items listed under section C of the contract, which pertained to the new circular driveway.
¶ 18. Randy Robertson testified for the State as an expert in residential construction. Robertson stated, in his opinion, all the work performed by White on the project, up until the point the Buchanans had ceased payments to White, was worth approximately $9,300. Having viewed photographs taken by David in January 2006 (which was prior to when David had hired a new contractor to complete the project) and inspecting the property afterwards, Robertson provided the following estimates with regard to his assessment of the reasonable value of the work that had been completed by White on the project prior to December 16:
Plumbing rough-in: $2,000
Form materials: $1,600
Labor to remove portions of the existing garage: $950
Demolition: $3,250
Plans: $1,500
¶ 19. White, who did not testify at trial, presented one witness during the defense’s case-in-chief. Bert Green testified on White’s behalf as an expert in residential building and remodeling. Green estimated that White had performed $49,286.47 worth of work on the project. Green based his estimation on a number of sources, such as: White’s statement to the AG investigator, interviews Green had with White, and Green’s review of the same photographs taken by David in January 2006 that Robertson had viewed. The following cost estimate was prepared by Green prior to trial, provided to the State during discovery, and introduced by the State into evidence during its case-in-chief:
Plans: $4,900
Soil engineering: $455
Demolition (removal of driveway): $4,200
Site work: $6,540
Electrical: $500
Plumbing rough: $2,448
Septic tank unit (removal and installation): $5,500
*492 Form materials: $1,800
Concrete materials: $8,956.87
Termite pretreatment: $752
Labor foundation form: $1,487.50
Labor finisher: $1,723.30
Supervision costs: $2,800
Trash removal — dumpster: $400
Trash removal — labor: $200
Portable toilet rental: $250
Sub Total: $37,912.67
Unscheduled expenses (@ 5%): $1,895.63
Profit & Overhead (@ 25%): $9,478.17 Total: $49,286.47
¶20. The jury found White guilty of home-repair fraud. The county court held a restitution hearing five days later, without the jury. The county court ordered White to pay restitution to the following entities and persons in the denoted amounts:
(1) Spencer Concrete - $ 3,490.34
(2) Hercules Concrete - $ 683.81
(3) Steve Tyner - $ 2,000.00
(4) Karen Powell - $ 1,400.00
(5) David Buchanan - $29,965.18
TOTAL: $37,539.33
DISCUSSION
I. NO DISPROPORTIONATE AMOUNT OF WORK WAS DONE TO THE BUCHANANS’ HOME AS COMPARED TO THE AMOUNT OF MONEY ADVANCED BY THE HOMEOWNERS.
II. CONTRACT SPECIFICALLY PROVIDED THAT IF PAYMENTS ARE NOT MADE, THE WORK SHALL CEASE.
III. EVIDENCE WAS ERRONEOUSLY ALLOWED INTO THE CASE THAT WHITE HAD FAILED TO PAY SOME OF HIS SUBCONTRACTORS.
¶ 21. To avoid repetitiveness, we address issues one, two, and three together. White argues that he was not guilty of home-repair fraud, because as his expert witness, Green, testified, the $53,050 paid by David was not disproportional to the work done on the project. White contends that the building contract between him and the Buchanans contained a valid and enforceable provision which allowed him to cease work on the project if the Buchanans failed to make a timely payment. White also contends that evidence showing he had failed to pay some of his subcontractors was both irrelevant and prejudicial because whether or not he paid his subcontractors had no relation to the charges against him for home-repair fraud.
¶ 22. The State responds that despite what White claimed at trial through his expert witness, the State’s evidence showed a large “chasm” between the amount of work done by White and the amount of money advanced by the Buchan-ans, and the jury chose to believe the State’s evidence over Green’s expert opinion. The State maintains that White was not prosecuted for having a fee dispute with the Buchanans; rather, White was prosecuted for entering into a contract with the Buchanans knowing that he would not perfoi’m the promises contained therein. Such performance, the State contends, included White’s promise to pay his subcontractors, which the State submits was important enough to be an independent provision within the terms of the contract.
¶ 23. We review a criminal conviction “in the light most favorable to the conviction.” King v. State, 798 So.2d 1258, 1261 (¶ 12) (Miss.2001). A verdict will not be set aside unless the evidence shows that no reasonable person could have found the accused guilty beyond reasonable doubt. Bush v. State, 895 So.2d 836, 843-44 (¶ 16) (Miss.2005). Determinations regarding *493 the credibility of witnesses and the weight to be given their testimonies rest with the trier of fact. Miller v. State, 983 So.2d 1051, 1054 (¶ 14) (Miss.2008). The admissibility of evidence lies within the sound discretion of the trial judge; error will not be found unless the trial judge abused his or her discretion. Mixon v. State, 921 So.2d 275, 277 (¶ 6) (Miss.2005).
¶ 24. Section 97 — 23—103(2)(4) provides, in pertinent part, the following:
(2) A person commits the offense of home repair fraud when he knowingly:
(a) Enters into an agreement or contract, written or oral, with a person for home repair, and he knowingly:
(i) Misrepresents a material fact relating to the terms of the contract or agreement or the preexisting or existing condition of any portion of the property involved, or creates or confirms another’s impression which is false and which he does not believe to be true, or promises performance which he does not intend to perform or knows will not be performed;
[[Image here]]
(3) Intent and knowledge shall be determined by an evaluation of all circumstances surrounding a transaction and the determination shall not be limited to the time of contract or agreement.
(4) Substantial performance shall not include work performed in a manner of little or no value or work that fails to comply with the appropriate municipal, county, state[,] or federal regulations or codes.
¶ 25. The State prosecuted White on the basis that he entered into a written contract with the Buchanans for certain renovations and additions to their home with no intention of performing the promises set forth therein or that he knew those promises would not be performed. The evidence shows that White told David following their December 16 conversation that he had purchased building materials for the project with the funds David and Joanne had provided and that the materials would be delivered to the job site. They were not. White later gave a statement in which he justified essentially every dollar advanced to him. The only building materials mentioned in the statement, however, were those for the concrete foundation, which everybody agrees had been completed prior to December 16. The State’s evidence significantly contravened the value of the other work/items listed in the statement, and the jury obviously rejected the information provided by White’s expert, Green. One can logically infer from White’s conflicting representations, and the evidence in general, that White could not account for the advances provided to him by the Buchanans. One can also logically conclude from White’s reported conduct in the matter (e.g., misrepresenting that materials would be delivered, failing to pay his subcontractors as promised, not responding to the Buchanans’ repeated attempts to contact him, etc.) that he used the provision in the contract, which allowed him to cease work on the project, as a pretext to walk away from the promises he knew would not be performed, thereby concealing his intent.
¶ 26. Viewing the evidence in the light most favorable to the verdict, we find that a reasonable fact-finder could have found the above-mentioned elements of the crime beyond a reasonable doubt. For these reasons, we find no merit to issues one, two, and three.
IV. COUNTY COURT REFUSED TO GRANT DEFENSE JURY INSTRUCTION D-12
¶ 27. White contends that the county court erred in denying defense jury in *494 struction D-12, which stated, in part, that: “The [c]ourt instructs the jury that if the jury believes [the Buchanans] materially breached the contract entered into for home repair fraud by failing to make payments as required by the contract ..., then the jury should return a verdict of not guilty.” The county court denied the jury instruction because it appeared to work an “absolute defense” for White to the crime of home-repair fraud.
¶28. We agree with the county court. Section 97-28-108 contains no language that excuses a person’s criminal culpability for entering into a contract with a homeowner with promises of performance the person knows will not be performed, based on the homeowner’s subsequent conduct in relation to the contract. Accordingly, we find that jury instruction D-12, as worded, incorrectly stated the law and was properly denied. See Miller v. State, 801 So.2d 799, 805 (¶ 27) (Miss.Ct.App.2001) (holding that a defendant is not entitled to a jury instruction which incorrectly states the law). This issue is without merit.
V. COUNTY COURT REFUSED TO CONSIDER THE TESTIMONY OF WHITE’S DEFENSE EXPERT WHEN DETERMINING THE AMOUNT OF RESTITUTION.
¶ 29. White’s sole contention with regard to the county court judge’s restitution order is that the judge’s determination of the amount of restitution owed was fundamentally flawed because the judge refused to take into consideration the estimates presented by his expert witness, Green.
¶ 30. Factual findings made by a trial judge sitting without a jury will not be disturbed on appeal unless such findings are clearly erroneous. House v. State, 754 So.2d 1147, 1152 (¶ 22) (Miss.1999). Again, determinations regarding the credibility of witnesses and the weight to be given their testimonies rest with the trier of fact. Miller, 983 So.2d at 1054 (¶ 14).
¶ 31. During the trial, the county court heard extensive testimony from both Green and Robertson. Each expert was allowed to develop the bases for his findings with regard to the estimated value of the work White had performed versus the amount of money David had advanced to him. The county court also heard testimony from witnesses who claimed White had failed to pay for their services provided on the project.
¶ 32. Based on our review of the record, many of Green’s cost estimates were based on White’s statement provided to the AG investigator, much of which was negated by the State’s evidence. This, of course, brought into question the credibility of Green’s cost estimates. The county court, nonetheless, accepted some of Green’s cost estimations and rejected others. Sitting as fact-finder in the sentencing phase, the county court had the discretion to do so, and we find no abuse thereof. This issue is without merit.
VI. SUBJECTING WHITE TO CRIMINAL PROSECUTION WOULD OPERATE TO SUBJECT AN ENORMOUS NUMBER OF CONTRACTORS OPERATING IN THIS STATE TO PROSECUTION.
¶ 33. White offers no authority in support of this issue. “Failure to cite relevant authority obviates the appellate court’s obligation to review such issues.” Simmons v. State, 805 So.2d 452, 487 (¶ 90) (Miss.2001). Therefore, we find this issue is procedurally barred.
*495 ¶ 34. THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT OF CONVICTION OF MISDEMEANOR HOME-REPAIR FRAUD AND SENTENCE OF SIX MONTHS IN THE CUSTODY OF THE SHERIFF OF MADISON COUNTY, WITH ALL BUT FIFTEEN DAYS OF SAID SENTENCE CONDITIONALLY SUSPENDED, AND TO PAY A $1,277 FINE AND $37,539.33 IN RESTITUTION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING, P.J., MYERS, BARNES, ISHEE, ROBERTS, MAXWELL AND RUSSELL, JJ„ CONCUR. CARLTON, J„ NOT PARTICIPATING.